Good morning. May it please the Court, Anup Prasad, Asian Law Caucus, on behalf of Ms. Nguyen, the petitioner. Here, the Board found that Ms. Nguyen's conviction under 7 U.S.C. 2024b was categorically a fraud offense, and the loss stemming from the fraud exceeded $10,000, making her removable as an aggravated felon. Alternatively at issue is whether the Board properly reversed immigration judges' finding of withholding of removal, where Ms. Nguyen had previously been imprisoned in Vietnam for four years and tortured because her husband had assisted U.S. forces during the war. The Board got the aggravated felony finding wrong on two grounds. First, it erred in finding that her offense was categorically a fraud offense. And second, it erred in finding that the loss exceeded $10,000. I'd like to look at the fraud portion of the finding first. Excuse me, let me just ask. Are you saying that the only error the Board made are with respect to the fraud finding and the categorical finding? I'm trying to find out what your whole argument is, because you said I have two points. Right. So the first point is that it erred in finding that her conviction categorically involved fraud, and second, it erred in finding that the record established that the loss to the victim exceeded $10,000. And those are the only two points that you're arguing today on what the Board – how the Board erred in its decision. I am – and also I would argue that even if it hadn't found it was categorically a fraud offense, the modified categorical approach would not apply here. So in its decision in footnote 2, the Board said that 2024b was categorically a fraud offense, but the text of the statute doesn't include the word fraud. It doesn't include the elements of a fraud conviction. And at common law, fraud would require a false statement to a material fact, which was made with knowledge of the falsity, intent to deceive, and reliance by a party on the fraudulent statement. As we discussed on page 6 of our opening brief, there are a number of ways to violate 2024b which do not involve fraud. They include things such as paying for food with food stamps that have been detached from a booklet, using an unsigned booklet, or paying for food after it's been tendered to the customer. And it's a statement of the government's decision. Let me ask you a question. I'd kind of like to talk about withholding, but just talking about modified categorical approach, if I read the judicially noticeable documents, it seems to me that from a reading of those documents, I find that she admitted to being part of a conspiracy where she purchased food stamps for less than the face value. She admitted she gave stamps to others who redeemed them for face value. Then the profits were shared by all of the conspirators. Now, if you plead guilty to conspiring to conduct financial transactions with money that she knew was the proceeds of the food stamp trafficking, and she admits that she acted with knowledge that the transaction is designed in whole or in part to disguise the nature, location, source, ownership, and control of the trafficking, how am I to get out of finding the modified categorical approach does not sink your client? So, Your Honor, first we're limited by the board's holding, which was that it was a categorical crime involving fraud. So I need to send it back? Is that what you're saying? Well, I don't think necessarily send it back. So we would start with a text of 7 U.S.C. 2024b. And the text itself is not categorically a fraud offense. Now, some convictions — Even if I agree with that, don't I just go to the modified categorical approach? Well, so under this Court's previous holding of Barra-Lopez, if the statute is missing an element of the generic crime, you don't move forward — Barra-Lopez is out. Right. I understand that, Your Honor. But still, under Aguilo-Montes, that's still true. In Aguilo-Montes, Justice Bybee held that if it was missing an element of the generic crime, you would move forward to the modified categorical. Which is exactly what we did here. Which is exactly what I did here. Right. So only if the truer of fact was required to find the elements of the generic crime would you move forward to the modified categorical. Here, the truer of fact was not required to find fraud. If you look at count 3 in the indictment, it says that she used, transferred, acquired, and possessed food stamps in violation of the food stamp regulations. And so if you look at the statute, it's listed in or, but here it's listed in the conjunctive. And Justice Bybee stated in Aguilo-Montes' opinion that where it's listed in the conjunctive as opposed to the disjunctive, the truer of fact doesn't need to find every one of those to be true. You really want us to ignore the plea agreement, right? It just seems to be inescapable. She offered up the facts to support the plea, and those facts reflect fraud. Isn't that the case? Well, so the plea agreement simply states that she violated 7 U.S.C. 2024b as stated in count 3 of the second superseding indictment. And that says that she knowingly used, transferred, acquired, and possessed. And if you look at Aguilo-Montes, it addresses this. Justice Bybee gave the example of a conviction where the generic crime was assault with a firearm. And the actual conviction was for assault with a firearm and an ax. And he said in there that since it's in the conjunctive and the statute's in the disjunctive, the truer of fact is not required to find both. And so it's insufficient to show that the truer of fact found all the elements of generic crime, and you can't move forward to the modified categorical approach. Here we're limited to finding whether or not it's 2024b is categorically. The plea agreement refers to conspiring to conduct financial transaction with property that was the proceeds of trafficking and food stamp coupons with a face value of $5. It's not that I used a coupon that was out of date. The other theoretical possibilities it raised under the statute, the plea agreement is more specific than that. Your Honor, she's applied to three counts. Count 1 was conspiracy. Count 2 was money laundering. And count 3 was the 2024b conviction. The Board's decision here relied solely on the 2024b conviction. And so we're limited to count 3 of the plea agreement and count 3 of the indictment to determine whether or not there's an aggravated felony here. Supposing I don't buy your agreement, your idea here. Is your client, has she lost? In this case, if I don't buy what you're trying to sell me here. Can we move forward to the modified categorical approach? I don't know. We're in the modified categorical approach. We're in it. We've already lost that one. If we move forward and under the modified categorical approach, you find that it was a fraud offense? Yes. Well, then we'd move on to the $10,000 issue, whether or not the loss involved is worth $10,000 or more to the government. And so Nijiwan altered the analysis. But still, in Nijiwan it cautioned that the amount of loss must be tied to acts of fraud for which the defendant was convicted. And here the government cites to a number of places in the indictment and plea agreement, but those are from other counts. They're not from count 3. Any losses that go towards the $10,000 must be tied to conduct under count 3 of the indictment for food stamp violations. And so you're suggesting that your admission that she had profit of $106,531 made on food stamp transactions does not apply to count 3? It doesn't apply to count 3. There are a few issues with that. First, in a Federal conviction, the restitution amount is not limited to grounds which are convicted. It can include amounts from grounds which are dismissed. And that was this Court's holding in Chang v. INS, that the restitution amount in a Federal conviction can't be used to establish amount of loss. The second is that amount of $106,531. Her transactions were really exemplary of the many transactions in which she participated, weren't they? Well, she only pled in her plea agreement that there were two transactions, and those amounts of loss in those two transactions were about $7,300, below the $10,000 limit. And so when she pled, she didn't admit that every single factual allegation in the indictment was true. She simply admitted that she did violate 7 U.S.C. 2024b, and she admitted the two overt acts are in the plea agreement. But she didn't admit every single fact stated in the indictment. And so there's nothing in the statute which says the loss is more than $10,000, and there's nothing in the plea agreement or indictment that says the loss exceeded $10,000, stemming from acts that underlined her 7 U.S.C. 2024b conviction. And so if you look through the rest of the documents, the pre-sensing report summarizes the indictment, but again, it doesn't tie particular losses to the 2024b conviction. The other issue with the pre-sensing report is that it states in there that the amounts of losses attributed to each defendant when totaled exceed the total loss to the government, which they attribute the same loss to multiple people. And so in most of the incidents listed in the pre-sensing report, it's difficult to tell who was really responsible for the loss. So the only place that conduct underlying Count 3 and her 7 U.S.C. 2024b conviction is tied to losses is in Count 3 of the plea agreement. And that lists two overt acts in which she purchased food stamps for below face value. But if you look at those two, the loss to the government was only $7,335. That's the only loss that can be attributed to her under Nijuan. I can accept that she signed a plea agreement that acknowledges she was involved in purchasing $277,000 in food stamps for $171,000, which led to the calculation of the restitution amount.    to tell who was really responsible for the loss. Why do we disregard the factual acknowledgment contained in a plea agreement, which is a noticeable document? So Nijuan cautioned that we're not looking at general conduct. We're looking at conduct which must be tethered to a conviction. And Nijuan cited Third Circuit's decision in Awaka which says you must directly tie the loss to conduct which led to the conviction. And so that loss, it could be tied to Count 1, it could be tied to Count 2. But in order to establish the $10,000, you have to tie it directly to what she was convicted of under Count 3. And there are only two overt acts listed in the entire record tying her to Count 3. Do you want to talk to us about Catt for withholding? Certainly, Your Honor. So the immigration judge granted withholding finding that she had experienced past persecution. And past persecution leads to a rebuttal presumption of future persecution. The board largely overturned her finding of the immigration judge's finding of future persecution based on a short trip that she had taken to Vietnam. Now, there was evidence in the record that Vietnam investigates the political backgrounds of deportees, but the board did not acknowledge that evidence in its decision. The only evidence was the country condition reports and that she had returned for two weeks to visit her son to Vietnam. And the board did not properly consider the record in determining that she did not have a fear of future persecution. Isn't it true that the BIA found her credible? She was found credible, and the board did not And she also, they also assumed past persecution. That is true, Your Honor. They did find past persecution, but found that it had been rebutted by fundamental changes in the country. As to your cat claim, where do you address your cat claim in your opening brief? The, on appeal is the board's position. Where do you address it in your opening brief? I believe withholding was only addressed in the opening brief, Your Honor. So then you're waiving your cat claim? Yes, Your Honor. So withholding is the only thing we have in front of us? Yes, Your Honor. If I could, I'd like to reserve the rest of my time. Thank you, counsel. Good morning. May it please the Court, I'm Lyle Gentz from the Department of Justice's Civil Division, Office of Immigration and Litigation, and I represent the Respondent Attorney General. Moving to the first of the issues. Why don't we start at the last? Judge Smith asked about withholding and the finding of past persecution. What's your response on that? Moving to the withholding issue, Your Honor? Yes. Fine. You had a credible applicant and you had a past persecution assumption. Okay. Actually, the BIA just assumed without deciding credibility, the IJ said he would not rely on her testimony because she was so confused and he could not figure out whether she was credible or not. Well, whether they assumed it or whether they didn't, they said she was credible and they went and made their decision on the fact that she was credible and that she – and they assumed past persecution. Assuming she was credible and that there was past persecution, if you take a very close look at the immigration judge's decision, he relied on the State Department report to say the conditions in Vietnam were pretty terrible and he relied on a document as to repatriation from the Vietnamese embassy talking about that she had to have a good political attitude to be returned to Vietnam. That's all the IJ cited. The IJ never even touched upon the fact that she had returned to Vietnam voluntarily under her own name to visit her children for four weeks. Well, I'm sorry. The trip was four weeks, Your Honor. She was there for three weeks and encountered absolutely no problems with the Vietnamese government. Where past persecution has been shown, isn't it true that we cannot take a general report of conditions and apply it to determine withholding? That we've got to – where it is that we have a general report, we can't discount, if you will, what she says by a general report of conditions. Well, what you then have to look at, Your Honor, is the State Department report which talks about what's happening in Vietnam now. It's about – that's a general report. Well, but it's a – Where did the BIA put that general report as to her personal circumstances, her individualized analysis of how the conditions had changed? What the BIA said as to that, Your Honor, all I can do is go with what the BIA's decision is, is that, one, once she was released from prison after deeding her 10-hectare farm, she was released immediately. And that comes from Lucky Locke's statement, her husband's statement. The BIA then said she had no – that there was no evidence that there was any interest in her after that. She was allowed to leave Vietnam. Her husband was released. Was she – did she leave Vietnam lawfully? Or I thought they left on their own. That is not clear from the record. We just don't know. We do know – After she gave up her land to get out of jail, they didn't do anything to her.   They just told us that she was being persecuted, that she was being persecuted after they had gotten the bribe, and then they let her go to the United States. That's what the record seems to imply, yes, Your Honor. Yes. And what does that tell you about what they would do to her if she came back to Vietnam? It doesn't tell us anything. It does – All we know is that she was persecuted. She ended the persecution by giving them her land and leaving the country. But it doesn't show anything about what they would do if she came back to the country as somebody who was persecuted while she was there. Well, the only thing that shows us that, Your Honor, two things. One, that she did return. First of all, by returning, she evinced an attitude that she was not afraid to return. Well, no, she didn't evince that kind of attitude. She evinced an attitude that she desperately missed her son and wanted to see him. And maybe at whatever risk there might be, a mother wants to see her son. That doesn't evince an attitude that, oh, everything is going to be wonderful. Not that it will be wonderful, but clearly it can go both ways. And remember, Your Honor, that it's not the way the Court would interpret it. It's whether substantial evidence supports the Board's decision. And certainly that kind of a decision on her part can be interpreted that she was not afraid. Well, I guess my worry is that I looked all over in what the BIA had said, and I didn't find anything where they took into account the Vietnamese government policy of expecting the political record and the attitude of those returning as applied to this situation. That's what she was arguing. And they didn't talk about that. All they talked about was she went back one time before as a tourist and came back to the United States. They didn't really take into account her argument, which I can't look at the general report of conditions because that's inappropriate. I've got to have something individualized as to her. And in addition to that, the BIA says, Well, the fact that you can get away with something for three weeks without being found, why does that tell you that you're not going to be found later and persecuted? Three weeks of frustrating the government. I don't quite understand the logic of saying that you can escape detection for three weeks means you can escape detection for a year. Well, let me answer that with the first part. Responding to you, Your Honor, the document you're mentioning, which is at page 338, actually supports the government's view. And the reason it was not mentioned is because that is conditions for repatriation. If, in fact, what that document states is that if, in fact, the Vietnamese government believes that she is some sort of a political dissident, that she's got anti-Vietnamese views, she won't be allowed back into Vietnam, not that she'll be persecuted. And that's the reason the Board did not consider that decision. That is my hypothesis. That's what I surmise. I mean, the Board did not say. I was going to say, that's the first time I've heard that. And that is absolutely correct, Your Honor. Already. I have to surmise that, Your Honor. And that's why they did not. And there's a good chance that when the Vietnamese inspect all of this, after you spend all these years trying to deport an 84-year-old lady, when you get all the orders you can get, then you've got to get the Vietnamese government to get her to agree. And you don't have any idea what they're going to say when you ask her to be returned. How much money are you spending on trying to do this and having the Vietnamese then tell you, we don't want her back? I don't know that we've spent any money yet, Your Honor. We're waiting on it. You don't have a salary? Oh, you're talking. Last time the government lawyer told us it was going to cost hundreds of thousands of dollars. We said, for what? He said, well, I've got a salary. That's why I wondered whether that was the way we viewed the money that was spent. Sorry, Your Honor. I'm a little bit confused. Not you. Oh. No, no. I'm not confused. But all right. Let's go back, in any event, to it's true. You're right that when you get through with all these proceedings, if you ever get to the point where you decide you're really going to deport her, then you've got to get the consent of the Vietnamese government. That is correct, Your Honor. But there's still another issue, another thing. But you were going to come back to my question about why you say, well, she managed to escape detection for three and a half weeks or three weeks, whatever it is, which shows somehow that she has no risk of persecution. I think when we consider that with the fact that her children have lived there in Saigon, which I guess is now Ho Chi Minh City. I think it's mentioned in the record as Saigon. For all this time, with nothing happening to them, they've been safe. The fact that her husband went back with her. They were never put in jail for four years, and her husband was put in jail. But these children never were put in jail. But they're all part of the family. We're saying that she's tainted by what her husband did. That's why she was put in jail, isn't she? But they're tainted by what their father did to the same extent. But they weren't put in prison. And that goes, the board mentioned the fact that they've been safe, at least I believe the board did, and that would show or that would support the board's inference that they're not interested in her anymore. This is three and a half years. I'm sorry. I don't understand that logic. Her husband was put in prison for 10 years because of being a friend of the United States. She was put in prison for four years because of her husband's activities. That was assumed. We don't really know why she was put in jail. Her children were never put in prison at all. That is correct. So what does that prove about her? It would appear to prove basically what the board said, or it would appear to indicate. It doesn't prove anything, but it would appear to indicate that what they were interested in was her land for whatever reason. And as soon as she released it, they lost interest in her. Well, but the difficulty with that is that she left, and so she wasn't in a position to be further abused. If she comes back, particularly if she comes back after spending a couple of decades in the United States, suddenly the possibility of getting more assets out of her sort of presents itself, doesn't it? It would depend if they believe she has any assets. The BIA's decision speaks, accepts the proposition she'd been persecuted. And then it says, they think that the record contains evidence demonstrating a fundamental change in circumstances such that the Respondent no longer has a well-founded future persecution. But the only thing I see that suggests a change in circumstances isn't a fundamental change in the society. It's that she came back for three or four weeks and, using the BIA's own language, without ever being detected, disturbed, or detained. Well, if it's that she wasn't detected, that really doesn't tell us much of anything about what might happen if she's sent back afterwards. The only thing that we do have, and I do understand, Judge Reinhart, that you're not very happy with this because it comes from the State Department. But if you look at page 370, what the State Department says is that old-time soldiers face discrimination in employment, but that's it. There's just nothing about that because they opposed the government 40, 50 years ago, that at this time they're going to be persecuted. And does the BIA reference that at all? I don't believe that they did in the decision, Your Honor. See, that's the problem. You're making great arguments, but I'm reading the BIA record, and I don't see any of it. And as I understand it, when we got past persecution, there's a change in the burden of proof. And the government has the burden of proof. And the government can't use the generalized information from the State Department to meet their burden. The government has to prove that the past persecution, and I'm reading what they say here, they cannot discount, this is Lopez versus Ashcroft, cannot discount, the BIA cannot discount it merely on a say-so. Rather, our president establishes that in such a case, the BIA must provide an account on this lady of what their policy is. So it seems to me that if I was to apply that, in this case, the BIA should have undertaken an account on this lady of what their policy is. When she goes back, she's not going to go undercover this time. It's going to be, they're going to know she's there. As a part of the changed country conditions, I found it not in the BIA's decision. And it's not in there, Your Honor. I mean, I can't argue that it is, because obviously it's not. What we would then conclude with as to this, as we did in our brief, is, and I know the Court says that the Board found her credible, but the Board sidestepped that issue. And now it would have to go back under Thomas for a credibility determination to see what really happened, to see what the Board's going to do. We would also point out, of course, that once this Court reaches its decision, then it goes back to ICE to see what they want to do with it for prosecutorial discretion. And how old do you think this lady is going to be when we next get this case? Probably old enough that she may not have to go back, Your Honor. I was hoping she'd be old enough that ICE wouldn't think this was a productive use of its resources. And I'm not sure that they will consider that, Your Honor. I have been in close contact with ICE. Why don't we refer this to mediation? Have you ever done that? I think this case would be fine for mediation, Your Honor. I would have no problem with that. Well, that sounds like a pretty good solution, in which case we wouldn't have to examine the failure to make the individual application. I would be very happy to put this case in mediation. Okay. As I said before, when I was talking about your salary, which I'm sure is not terribly high, judging by our salaries, it was not a criticism of you. It was a general observation. Some of the arguments we received from ICE attorneys, the one who told us how it would cost hundreds of thousands of dollars and could only give us his own salary as a basis for that, but you certainly have not done that. Thank you, Your Honor. Thank you. And we do appreciate your cooperation. And Jennifer Smith's suggestion is an excellent one. I conclude by saying that Judge Easterbrook had nothing to say about this case. This is not one that he is in. You ought to win just because you said that. Counsel, I shouldn't ask this question, because Judge Smith is ahead, but don't you think it would be a good idea to send this case to mediation? Yes is the answer. I'm still confident that, in my argument, that she's not removable as an aggravated felony. Well, you can use that as a moot court argument when you instruct the young attorneys in your firm, if you're in a firm. I'm not a nonprofit. I'm not a nonprofit. Learn sometimes from her. I will give you some inside scoop. I'm not the first one who thought you ought to take this to mediation. ICE has expended extensive resources on this case. She spent almost two years in immigration detention and only got out because we filed a habeas in district court to get her out of detention. So now that she's out of detention, you're perfectly happy and you can go to mediation and continue to try to get her to remain permanently. I would look into mediation. There are some problems that are going to arise if she does get mediation and this case is dismissed. An aggravated felony conviction would permanently bar her from naturalization of the SSN. Mediation isn't the end of the case. Mediation means we sit on our hands until you guys come back and report whatever the result of mediation is. We're not asking you to concede that you're going to lose. Quite to the contrary. It's because the government has reason to think that the outcome is uncertain and it's motivated to think that mediation is a good idea. And that's probably a good answer for you, too. I'm more than happy to look into mediation. A good answer. I would like to raise one point, is that the Board and the government both base their categorical fraud finding on the Supreme Court's decision on Liparota. But I think they misread Liparota. What Liparota said is that 2024b has a knowledge of illegality requirement, but knowledge of illegality does not translate into intent to deceive, as this Court held in Notas v. Gonzales. And so I think the government and the Board both overstepped what the actual holding of Liparota was. I hope, I very much hope, Counselor, that you took note as you sat there where the Court focused its questions. Yes, Your Honor. And by the Court focusing its questions on the withholding issue, not these other issues, that you don't take big steps to suggest that we are that positive about your other argument, I would suggest that you go into mediation. Rather than saying you got a great argument, we're going to help you on, that you go into mediation and get your client the best result you can get. Yes, Your Honor. Were you saying that you're concerned that she won't be able to get, what, citizenship, or what is it? There are some penalties. If we were to go back to ICE and they grant prosecutorial discretion, which means they drop the case, without a finding that she wasn't convicted of an aggravated felony, she would be barred from citizenship for life. And how long has she been here now? She's been here over 30 years. Without obtaining citizenship? No, Your Honor. No? She's not obtained citizenship, which is why we're here. 30 years. And she's now 84? And you're worried that she's... 83. 81? 83. 83. So you're worried she may not be able to get citizenship now, although she hasn't had it for 30 years? It's not my primary concern. My primary concern is that she stays in the U.S. I would hope so. Yes, Your Honor. Good. You finally got there. Okay. Thank you both very much. Thank you. The case just argued will be submitted.
judges: Reinhardt, Clifton, Smith